# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

MARIBEL MONTALVO RIOS,

    Plaintiff,

             v.

MUNICIPALITY OF GUAYNABO, ET AL.,

    Defendants.

**Civil No. 10-1293 (SEC)**

## OPINION AND ORDER

Before the Court are the defendants' motions for summary judgment (Dockets # 169 & 172), the plaintiff's oppositions thereto (Dockets # 197 & 210), and the parties' respective replies (Dockets # 220 & 238). After reviewing the filings and the applicable law, the motions are **GRANTED in part and DENIED in part**.

**Factual and Procedural Background**

This case raises an issue of public import: The proper standard for determining when a high level official of a municipality is its proxy or alter ego for purposes of potential automatic employer liability for sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. It also presents the opportunity to address whether the First Circuit's decision in <u>Fantini v. Salem State Coll.</u>, 557 F.3d 22 (1st Cir. 2009) tacitly overruled a putative exception to the no-individual-liability rule under Title VII: The so-called alter ego doctrine, as construed by some cases in this district.

The procedural history of this case has been neither straightforward nor laconic, and the facts are voluminous. In order to properly set the stage for the analysis, a comprehensive and specific recount of the procedural details in this case is indispensable. Maribel Montalvo Rios filed this federal question suit against the Municipality of Guaynabo (the "Municipality") and its then-police chief Carmelo Correa under Title VII, alleging sexual harassment and retaliation. Montalvo also invoked supplementary jurisdiction under (1) Law 100, P.R. Laws. Ann. tit. 29,

§§ 146-151; (2) Laws 17 and 69, P.R. Laws Ann. tit. 29, §§ 155 1321; (3) Law 115, P.R. Laws Ann. tit. 29, § 194a; and (4) Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141 5142.

The following relevant material facts, drawn from the deposition testimony, affidavits, relevant statutes, and other documentary evidence, are outlined in a light most favorable to the non-movant, Montalvo. See Pérez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 20 (1st Cir. 2011).[1]

Just like its sister municipalities, the Municipality "is the juridical entity of local government, subordinated to the Constitution of the Commonwealth of Puerto Rico and to its laws, whose purpose is the local common welfare and within it, primarily, the handling of the affairs, problems and collective needs of the inhabitants thereof. P.R. Laws Ann. tit. 21 § 4003. "From a[] historical point of view," the Supreme Court of Puerto Rico has explained, "municipalities have existed as government autonomous entities with the purpose of facilitating the effective achievement of their politico-administrative ends. It has also been said that municipalities exist with the purpose of enforcing a state power that could be exercised by the

---

[1] The Municipality argues extensively that Montalvo contravened D.P.R. Civ. R. 56(c) (requiring party opposing summary judgment to submit a separate, short, and concise statement of material facts admitting, denying or qualifying the corresponding facts that support the motion, with record citations in support). Specifically, the Municipality correctly observes that Montalvo submitted an opposing statement of material facts, but included additional information as to each opposed fact that did not specifically correlate to the Municipality's proposed facts. See D.P.R. Civ. R. 56(c) (indicating that "opposing statement may contain in a separate section additional facts") (emphasis added). This is not the first time that Montalvo's counsel has engaged in this tactic, see Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 137 (1st Cir. 2012). The Court disregards Montalvo's improvident statements. See Malave-Torres v. Cusido, No. 11-1432, 2013 WL 310246, at *6 (D.P.R. Jan. 28, 2013) (to be published in F.Supp.2d) ("[A] party may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts.") (citations omitted). This ruling, however, does not have any practical effect on the summary judgment determination, because the relevant facts here are drawn from the deposition testimony, affidavits, and other documentary evidence. Accordingly, the Municipality's 109-page motion to strike Montalvo's opposing statement of facts (Docket # 221) is **DENIED**. The Court nonetheless admonishes Montalvo's counsel for unnecessarily obfuscating the record.

government but not as conveniently as by the municipal entity." Colon v. Municipio de Guayama, 14 P.R. Offic. Trans. 249, 256-57  (1983) (citation omitted).  At its core, the Municipality is "governed by a local government composed of a Legislative Power and an Executive Power." P.R. Laws Ann. tit. 21, § 4001(u).

The mayor, of course, is the highest authority of the executive branch of the municipal government, and as such, is charged with the direction, administration, and supervision of the operations of the municipality." Id. § 4109. At the times material hereto,  Héctor O'Neill is the Municipality's mayor (the "Mayor"). As mayor, he has the power to "appoint all officials and employees and dismiss them from their positions when necessary for the good of the service . . . ." Id. § 4109(o).

Montalvo began working for the Municipality in 1992 as an Office Assistant. Docket # 244-1. A year later, the Municipal Assembly enacted Ordinance No. 84 of November 9, 1993 to establish a "Public Policy Manual on [S]exual [H]arassment." Docket #253-1, p. 1.[2] The ordinance also established an internal complaint procedure under which "[a]ny municipal employee may file a complaint for sexual harassment," with "their immediate supervisor." Id., p. 3 (bold omitted). This so-called "initial claim" could be verbal or in writing. Id.

While the Municipality is composed of various administrative units, the Municipality is the only entity that can sue and be sued. P.R. Laws Ann. tit. 21, § 4051(b).[3]  The relevant events

_____

[2]The "Declaration of Public Policy," embodied in Article 5, provides as follows:

The Municipality of Guaynabo believes that sexual harassment in the workplace is an illegal and discriminatory practice contrary to the best institutional interests that shall not be allowed or tolerated, regardless of the level, hierarchy or position of the people who may be involved. Nor may any person be allowed to create an intimidating, hostile or offensive work environment due to sexual harassment in any of its modalities. Docket # 253-1, p. 3

[3]Puerto Rico law requires that all municipalities have the following basic administrative units as part of their organizational structure:

occurred at the Municipality's Police Department (the "Department"). Although municipalities

are not statutorily required to establish a police department, see P.R. Laws Ann. tit. 21§ 4251,

Puerto Rico law allows municipalities to "establish a public vigilance and protection corps,"

P.R. Laws Ann. tit. 21§ 1063.

> The Department is in charge of
>
> compelling obedience to the ordinances and regulations promulgated by the corresponding municipality, provisions on illegal parking of vehicles, and to prevent, discover and investigate crimes of domestic violence . . . , breaking and entering, battery, and unlawful possession crimes as well as misdemeanors included pursuant to the Penal Code of Puerto Rico, and to persecute crimes committed in its presence, and within its jurisdiction or outside of them whenever it is necessary to conclude an intervention initiated in the municipality of its jurisdiction. Id.

The Department is in turn divided in two major areas: The civilian employees and the

"employees in uniform" (e.g., police officers) who follow the "rank system." Docket # 189-1,

p. 22:23-24. In 2005, the Municipality's Mayor appointed Correa as Police Commissioner.

Docket # 227-14.  As Commissioner, Correa was in command of the Municipal Police and of

its divisions, Docket # 227-9 p. 52:8-21, although the Mayor was his "immediate boss." Docket

# 185-1, p. 48:1-4.[4]  Puerto Rico law requires that the Department be "constituted into a unified

---

The Office of the Mayor
The Office of the Municipal Secretary
The Municipal Finance Office
The Department of Public Works
The Office for the Administration of Human Resources
The Internal Auditing Unit
The Municipal Emergency Management and Disaster Administration Office
The Municipal Federal Programs Office. P.R. Laws Ann. tit. 21§ 4251 (a)-(h).

[4] See P.R. Laws Ann. tit. 21§ 1061, which provides that

[t]he highest authority in the direction of the Municipal Police shall be vested in the mayor, but the immediate direction and supervision of the Corps shall be under the charge of a Commissioner. . . . In order to comply with the provisions of this chapter, the mayor may delegate onto the Commissioner all or some of the functions hereby reserved for the former.

organization system," whereby Correa was empowered "to determine the best use of human resources . . ."  P.R. Laws Ann. tit. 21§ 1067(g).

While the Mayor had the ultimate authority to fire an employee, in practice it was Correa who recommended termination to Human Resources, although "they did not necessarily always have to follow . . [his] instructions." Docket # 185-1, 42:15-17. By law, furthermore, Correa had to "propose" the appointments of "the members of the Municipal Police and the civilian personnel of the Corps," and then the Mayor would actually "make" the appointment. P.R. Laws Ann. tit. 21, § 1067(a). Regarding disciplinary actions, Correa was "empowered to set aside or confirm the punishment, or impose any other that he may deem reasonable . . . ." Id. § 1069.

Correa also "participate[d] in the process of creating public policy." Docket # 185-1, p. 52:19-21, insofar as he "made press statements" on behalf of the Municipality without prior approval from the Mayor. Id., pp. 52-53. He also had the power to "prepare[] and administer[] the expense budget of the Municipal Police" and "manage[] administrative complaints filed by citizens against Municipal Police personnel." Docket # 189-2, p. 2.

On July 1, 2006, Montalvo was transferred to the Department, becoming an "Executive Officer I" of its Purchases and Supplies Division, a civilian position that she presently holds. Docket # 244-2; Docket # 88, ¶ 15; Docket # 189-6, p. 2.  The Purchases and Supplies Division where Montalvo works is one of 15 divisions. Docket # 170-4; Docket # 227-9:51 18.21. Although Montalvo's immediate supervisor is Zaida Avilés, Docket # 185-1, p. 31:7-15, Correa was Montalvo's next-in-line (and ultimate) supervisor, and she "answered" to him. Docket # 189-6, p. 2. "Almost always," Montalvo testified in her deposition, she reported directly to Correa. Docket # 185-5, p. 92: 13-19.

From January 2009 until August 2009, Montalvo alleges that Correa sexually harassed her by subjecting her to a pattern of sexual advances and innuendos during work hours.  The most salient, but not all sexual harassment allegations, are reproduced as they appear in

Montalvo's Amended Complaint, see Docket # 72, ¶¶ 21-42, supplementing them with Montalvo's deposition and affidavit testimony, see, e.g., Docket 189-5 & 6, Docket # 244-12.[5]

The alleged sexual harassment began in early January 2009, when Correa told Montalvo "how good she looked," saying that the money she had just spent in a breast-augmentation surgery was "a good investment." Correa allegedly also told Montalvo that he "needed to see and taste the work done on her breasts." Montalvo testified that Correa's comments on and stares at her breasts were commonplace, and so were his unwelcome sexual gestures with his hand.

On January 30, Correa asked Montalvo if she ever had sex in the office and suggested that she wear a skirt to the office.  Correa also told Montalvo that "she would like it (the sex)," and that she should not be afraid.  Montalvo alleges that Correa justified his "illegal actions by saying that this was "modern supervision." Montalvo says that when she rejected Correa, he would often laugh, and say that "this was modern supervisor."  According to Montalvo, Correa would constantly boast that he was the "chief of this fucking Police Department."

In February, Montalvo alleges that Correa decided to invite her on a  date, assuring her that "'she would like it and that she should not be afraid.'"  Correa also tried touching Montalvo, repeating the term "modern supervision." Later that month, Correa entered Montalvo's office and asked her if she wanted to become "the first lady of the Police Department." Correa then entered Montalvo's office and asked her how long had she been single, explaining that "sex was important to get rid of the stress."  Correa also allegedly told her to arrive to work very early in the morning," so that they could make good use of the time alone." Plaintiffs says that when she again complained to Correa saying that he was sexually harassing her, he began to laugh saying that he was "'the chief of this fucking Police Department.'"

_____

[5]The Municipality does not dispute these allegations for purposes of summary judgment, although Correa vehemently denies them. E.g., Docket # 236-4.

According to Montalvo, around March 2009, Correa entered Montalvo's office and told her he liked her, and that he "was tired of telling her so and that she kept ignoring him." In April 2009, Correa allegedly asked Montalvo if "she still had not 'fucked' in the office yet," reassuring Montalvo "that she would know that sex was good for her and that she would come out from it greasy ('engrasadita')." In that same month, Montalvo says that Correa asked her if she liked men.

In May 2009, Correa allegedly did not allow Montalvo's co-workers to use her computer for work, "as they used to and needed to do." On another occasion, Correa again prohibited her co-workers from entering Montalvo's office, "as if she was his property." Montalvo alleges that Correa then asked her if any of her co-workers "was trying to win her." When she said no, Correa allegedly told her "'that there was one, him." Another alleged instance of harassment occurred at Montalvo's birthday in July 2009, when Correa told Montalvo that "he did not want any cake, that he wanted something else."

Sometime in August 2009, Correa allegedly stared at Montalvo's breasts again and commented about her breast surgery. This time, Montalvo alleges, Correa told her that he needed to "see the investment she had made" (referring to the surgery). On a "rainy day" on August 17, Correa allegedly told plaintiff that it was a "good day to be in a hotel making love and drinking." When Montalvo rejected his comments, Correa began to laugh. In another occasion in August, Correa asked plaintiff when she would go out with him. She replied never. When Montalvo tried to leave, then tried to touch her, and when she rejected him, he "began rubbing his genitals."

Things unraveled and on August 20, Correa ordered Lieutenant Luis Ortiz Cabrera to investigate Montalvo's alleged improper use of official vehicles for personal use. Docket # 189-1, pp. 61-62. According to Ortiz's deposition testimony, Correa informed him that Montalvo was "being transported home in the morning and in the afternoon." Docket # 189-15, p. 33:3-7. Ortiz complied, and the following day, August 21, he went by "[him]self to do the surveillance."

Id., p. 52:24-25. At 7:15 a.m., Ortiz parked his car at a shopping center near Montalvo's home; he stayed there until 8:00 a.m., but he "didn't see anything," so he left. Id., p. 53:4-10. The surveillance consisted in observing "[w]hether the patrol car came up and down [the street] and [Montalvo] was in the vehicle." Id., p. 54:24-25. Around 3:30 p.m., Ortiz "went back there" to resume the surveillance. Id., p. 58:21-23. He stayed there until 4:15 p.m. and again "didn't see anything." Id., p. 59:2-3.

That same day, August 21, at approximately 4:30 p.m., Montalvo filed an internal administrative complaint against Correa, alleging sexual harassment. The process was swift: By 7:20 p.m Montalvo had provided a sworn statement before the Human Resources Department. See Docket # 189-6. August 22 was a Saturday and 23 a Sunday; in neither of those days Ortiz surveilled Montalvo as part of the investigation ordered by Correa. Docket # 189-15, p. 76. Ortiz concluded the surveillance that Monday August 24, 2009. Id. Montalvo first found out that she was being "investigated" in September 2009, when another police officer informed her about it. Docket # 189-5, p. 174:4-7.

On August 26, 2009, Correa tendered his resignation letter. Citing "personal reasons and for the purpose of devoting more time to my family," Correa presented his resignation "effective August 31, 2009." Docket # 227-14. He also expressed his "sincere gratitude to you [the Mayor] for the opportunity . . . to belong to such an excellent work group." Id. According to Correa's deposition testimony, the Mayor refused to accept his resignation until Montalvo's allegations "were investigated." Docket # 174-1, p. 207:10-24. Instead, the Mayor ordered Correa to go on vacation again. Id.

The next day, the Mayor wrote to Correa regarding the internal harassment complaint filed against him. Docket # 189-7. In his letter, the Mayor prohibited Correa from visiting Montalvo or "hav[ing] any contact with her in the work premises of the Municipality of Guaynabo," citing the "provisional measures" implemented under the Municipality's "Public Policy Against Sexual Harassment in the Workplace." Id.   On one ocassion, Correa visited

Montalvo's workplace, resulting in a violation of the protective measured instituted by the Mayor. Docket # 189-8, p. 1. The Municipality did not condone Correa's violation of its order, and swiftly reprimanded him for the same. Id., p. 2.

After several procedural nuances, an administrative hearing was held on September 18 but was rescheduled for October 29, and then continued on November 10, 2009. Docket # 183-4, p. 1. Both Correa and Montalvo, who were duly represented by counsel, presented evidence on their behalf. Id., p. 3. On November 18, 2009, the investigative officer rendered a report concluding that Correa "ha[d] not displayed any sexual harassment [b]ehavior towards [Montalvo], but must be sanctioned for failing to comply with provisional measures imposed upon him." Id., p. 16. On November 23, the Mayor wrote a letter to Correa containing the "final determination" regarding the internal sexual harassment complaint. Docket #185-12. The letter reiterated the determination reached by the investigative officer that "there was not any behavior of sexual harassment by [Correa] against [Montalvo]." Id., p. 1. "Due to the fact that I have accepted your resignation," the Mayor concluded, "we are not making any determination regarding your violation of the provisional measures that were imposed on you." Id., p. 2.

On November  30, 2009, Correa presented a second resignation letter, which was identical to the first one. Docket # 227-20. The next day, the Mayor wrote back to Correa acknowledging receipt of his resignation letter and accepting his resignation "effective November 30, 2009." Docket #189-10. This suit followed on April, 8, 2010. Docket # 1.

The Municipality swiftly moved for dismissal for failure to state a claim upon which relief could be granted, see Fed. R. Civ. P. 12(b)(6), assailing the sufficiency of Montalvo's allegations. The Municipality also contended that it was entitled to the Faragher/Ellerth affirmative defense. See Faragher v. City of Boca Raton, 524 U.S. 775  (1998); Burlington Industries v. Ellerth, 524 U.S. 742 (1998). Montalvo timely opposed.

On October 19, 2010, the Municipality's motion to dismiss was granted in part and denied in part. Montalvo Rios v. Municipality of Guaynabo, 743 F. Supp. 2d 62 (D.P.R. 2010).

Relying on Correa's admission that he was "was the highest ranking official in the Police Department of the Municipality of Guaynabo," the Court held that Correa was the Municipality's proxy or alter ego. Id. at 68.  The Court then concluded that the Municipality could not  succeed on the  Faragher/Ellerth defense at the motion to dismiss stage. Because Montalvo had failed to meet the pleading standards under Iqbal, however, the Court dismissed Montalvo's retaliation claim.

Both parties timely moved for reconsideration. Montalvo argued that the Court had erred in applying the Faragher/Ellerth defense, reasoning that because it already held that Correa was the Municipality's proxy or alter ego, the Municipality was strictly liable for Correa's illegal conduct. In other words, the defense was unavailable under that scenario. She further contended that the allegations regarding retaliation were sufficient to survive dismissal. On this point, she also requested leave to amend the complaint to supplement her allegations regarding the alleged surveillance ordered by Correa. The Municipality, for its part, argued that the Court's conclusion that Correa was its alter ego was premature, because it required  a fact-specific inquiry and the complaint failed to set forth sufficient facts regarding the scope of Correa's authority within the Municipality.

In the interim, the United States petitioned to participate as amicus curiae in support of Montalvo's motion for reconsideration. Dockets # 44. The Court granted the motion.[6] The Government (hereinafter "amicus") ably alerted that the opinion

> raise[d] an issue of public importance regarding whether the affirmative defense to employer liability for harassment by supervisors, announced in . . . [Faragher] and [Ellerth], is available when the alleged harasser is of a sufficiently high rank within the employer's organization to be deemed an alter ego or proxy of the employer.  Docket # 45, p. 1.

---

[6] The United States, through the Attorney General, is charged with enforcing Title VII with respect to an employer which is a state or local "government, government agency or political subdivision." 42 U.S.C. § 2000e-5(f). Accordingly, the Government has a strong interest in the interpretation and application of Title VII and the judicial precedent under that statute. The Government's counsel has ably discharged such responsibilities and the Court thanks him for his well-stated arguments.

Endorsing Montalvo's position that a defendant like the Municipality would be automatically liable for sexual harassment by an alter ego or proxy of the employer (regardless of the existence of a tangible employment action), amicus requested that the Court grant Montalvo's reconsideration.

On reconsideration, the Court agreed with Montalvo and amicus that "the Faragher defense is unavailable when a defendant's official is an alter ego or proxy of the employer company." Montalvo Rios v. Municipality of Guaynabo, No. 10-1293, 2011 WL 1258618, at * 4 (D.P.R. Mar. 24, 2011). The Court, however, concurred with the Municipality, and set aside the holding that Correa was the Municipality's proxy. In doing so, the Court acknowledged that, under the circumstances present here, that determination could not be made at the pleadings stage. Id. [7]

Montalvo's objections to the retaliation holding did not fare as well, as the Court reiterated its determination

> that the complaint does not show that [Montalvo] was submitted to a "steady stream of abuse" sufficient to amount to a retaliatory hostile work environment under Title VII. Especially considering that [Montalvo] did not identify the names and specific instances when these alleged incidents occurred, or who she allegedly informed about the same, which also fails to satisfy Iqbal's requirements, and makes it impossible to determine the severity and nature of the alleged comments. 2011 WL 2518631, at * 6.

The Court also reaffirmed the dismissal of Montalvo's retaliation allegations that the Municipality conducted a "sham investigation" and hearing conducted by the Municipality. Id. "Clearly," the Court held, "the investigation and subsequent hearing were held in response to [Montalvo's] complaints of sexual harassment, and not in retaliation for the same." Id. The

---

[7] In deciding whether "to hold an individual liable as alter-ego of a corporation," the Court focused on six-factors announced by Arroyo Rodriguez v. Econo Supermarket Inc (incorrectly attributed to Cannabal v. Arabark Corp., 48 F.Supp.2d 94, 97-98 (D.P.R.1999)), to wit: "(1) whether the role of the individual was identical to that of the employer; (2) the individual's position in the corporation; (3) whether the individual was always physically there; (4) the individual's control over the employing entity; (5) the individual's decision-making power; and (6) whether the individual left any avenue for employees to object to his conduct." 204 F. Supp. 2d 289, 296 (D.P.R. 2002). As discussed later, see below section III, the Court should not have focused on this rigid test.

Court nonetheless granted Montalvo leave to amend her complaint to include specific facts to support the alleged "persecution" by Correa, reasoning that the requested amendment was not "futile insofar as courts have recognized that placing an employee under constant surveillance could be evidence of retaliation." Id. (citing Fercello v. County of Ramsey, 612 F.3d 1069, 1081 (8th Cir. 2010)).

Montalvo once again moved for reconsideration, claiming that the Court had improperly focused on the Econo factors (see note 7 above), which, she contended, were inapplicable to determining whether an individual was the alter ego of a public entity. Docket # 71 at 2-7. Montalvo also filed an Amended Complaint on April 4, 2011 (Docket # 72), supplementing the following facts in support of the retaliation claim based on "persecution": that she was placed under surveillance for filing a complaint with the Municipality. See Docket # 72 ¶ 76 (emphasis added). Once again, amicus supported her motion. Docket # 76.

Denying the motion, the Court stated that parties have identified "a complex issue of agency law that deserves, if anything, even more than the keen attention that the parties have so far given to the matter." Montalvo Rios v. Municipality of Guaynabo, No. 10-1293, 2011 WL 2518631, at *2 (D.P.R. June 24, 2011). The Court again made clear that "the time will come to talk of many things: of Faragher—and alter egos—and many things besides; but that time is not now." Id. The parties were again encouraged to advance their arguments on alter ego liability and the Faragher/Ellerth defense at the summary judgment stage.  Finally, the Court reiterated its holding dismissing with prejudice Montalvo's other retaliations claims. Id.

After the Municipality filed its amended answer in July 2011 (Docket # 88), the Court entered an amended case management order, and the case proceeded to discovery. After some discovery hurdles, see Dockets # 100-111, the Case Management and Settlement Conference was held on January 25, 2012. Docket # 113. Things quickly heated up in discovery, and a charged motion practice followed. Dockets # 114-152.

Finally, both the Municipality and Correa moved for summary judgment on June 15, 2012.  Dockets # 169 & 172. Correa's primary argument is that there is no individual liability under Title VII. The Municipality, for its part, argues that Correa was not its alter ego, and that it is entitled to the Faragher/Ellerth affirmative defense. With regards to the retaliation claim, the Municipality alleges that Montalvo has failed to show that she engaged in protected conduct before the allegedly retaliatory acts occurred, and that the Municipality has shown a legitimate non-retaliatory purpose in any event.

Montalvo opposed every single contention. Briefing continued all the way to December 2012. Each contention will be addressed in turn.[8]

**Standard of Review**

The Court may grant a motion for summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Kelley v. Correctional Medical Services, Inc., 707 F.3d 108, 155 (1st Cir. 2013). At this stage, it is axiomatic that courts "may not weigh the evidence," Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994), but must construe the record in the "light most flattering" to the nonmovant. Soto-Padro v. Public Bldgs. Authority, 675 F.3d 1 (1st Cir. 2012). Courts must similarly resolve all reasonable inferences in favor of the party opposing summary judgment. Id.

Because the summary judgment inquiry is grounded in the factual evidence available, one of its principal purposes "is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The Court may therefore consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(A). Inadmissible evidence, such as

---

[8] Correa's perfunctory, undeveloped, and meritless sovereign immunity contention is summarily rejected, however. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)

hearsay evidence considered for the truth of the matter asserted, is excluded at this stage. Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011).

Once the party moving for summary judgment has established an absence of material facts in dispute, and that judgment is proper as a matter of law, the burden shifts to the non-movant to "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Kenney v. Floyd, 700 F.3d 604, 608 (1st Cir. 2012) (internal quotation marks omitted); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (quoting Garside, 895 F.2d at 48). A material fact, in turn, is one that may affect the outcome of the suit under the governing law. Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008). The non-movant may not rest on conclusory allegations and improbable inferences. Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Neither "effusive rhetoric," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) nor "arguments woven from the gossamer strands of speculation and surmise," RTR Technologies, Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013), suffice to forestall the entry of summary judgment. In short, the non-movant must "point to competent evidence and specific facts to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011). Failure to shoulder this burden, "allows the summary judgment engine to operate at full throttle." Lawton v. State Mut. Life Assur. Co., 101 F.3d 218, 223 (1st Cir. 1996).

**Applicable Law and Analysis**

*Title VII*

I.      *Sexual Harassment (Hostile Work Environment)*

Both Correa and the Municipality argue, half-heartedly, that "[e]vidently, plaintiff's sexual harassment cannot survive summary judgment. Docket # 169, p. 21; see also Docket #

180, p. 19. In opposition, Montalvo asserts that the sexual harassment occurrences, which the Municipality admits for summary judgment purposes only, suffice to proceed to trial. The Court agrees with Montalvo.[9]

Title VII proscribes discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment is in turn considered a form of sex-based employment discrimination. E.g., Pérez-Cordero, 656 F.3d at 26. As relevant here, requiring a person "'to work in a discriminatorily hostile or abusive environment'" contravenes Title VII. Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (quoting Harris v. Forklift Sys., 510 U.S. 17 (1993)). To succeed on a hostile work environment sexual harassment claim, a plaintiff must establish the following factors: "(1) membership in a protected class and (2) unwelcome sexual harassment, (3) which was based on sex, (4) was sufficiently severe or pervasive, (5) was objectively and subjectively offensive, and finally (6) that some basis for employer liability has been established." Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 17 (1st Cir. 2013) (citing  Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 (1st Cir.2007)).

The defendants attack only Montalvo's failure to meet the fourth prong, arguing that the "conduct" attributed to Correa, "falls short of the level of either severe or pervasive to rise to the level of a Title VII actionable claim." Docket # 169, p. 21.  They also aver that because her "working environment" did not become "so hostile or abusive," Montalvo' "conditions of employment" were unaltered. Id. Their arguments fall way short.

With respect to the fourth prong, the First Circuit has made it clear that the linchpin of the evaluation is "whether the bad acts taken in the aggregate are sufficiently severe or pervasive to be actionable." Gerald, 707 F.3d at 18 (citing Noviello v. City of Boston, 398 F.3d

---

[9] Inasmuch as Correa denies the sexual harassment allegations (even for purposes of summary judgment), issues of credibility preclude summary judgment in his favor as to the attributed sexual harassment conduct. Correa's motion for summary judgment is accordingly **DENIED** on this score.

76, 84 (1st Cir.2005)). So while "there is no mathematically precise test . . . to answer this question," in analyzing the totality of the circumstances, courts should focus on the following, non-determinative, factors: "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." Id. (citing Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 73–74 (1st Cir. 2011)). "'Subject to some policing at the outer bounds,'" the First Circuit has admonished, "it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002)).

In this case, Montalvo shoulders her burden of creating an issue of material fact regarding the severity or pervasiveness of the harassment. A jury could easily decide that the alleged instances of sexual harassment (e.g., Correa's sexual innuendos, invitations, sexual gestures, staring at Montalvo's breasts and unwanted contact, among other serious occurrences) occurred on a frequent and intensive basis as to configure a hostile work environment claim. See, e.g., Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008) (reversing summary judgment for defendant on hostile environment claim, despite absence of touching or propositioning, when supervisor stared repeatedly at plaintiff's breasts); Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 19 (1st Cir. 2002) (finding that reasonable jury could conclude that an employee, whose supervisor had made "sexual remarks and innuendos," including "a sexual invitation," as well as "unwelcome physical touching" on five occasions in a little over a year had experienced sexual harassment); see also, e.g., Vera v. McHugh, 622 F.3d 17, 29 (1st Cir. 2010) (holding that genuine issues of material fact existed as to whether frequency and intensity of contact between female employee and supervisor, such as sexual stares, intentional contact of their legs while sharing a small office space for three months, altered her employment

conditions). This ends the matter. The defendants' request for summary judgment as to Montalvo's Title VII hostile work environment claim is therefore **DENIED**.

II.     *Retaliation*

Title VII also proscribes employer retaliation against those employees who oppose discriminatory employment practices. 42 U.S.C. § 2000e-3(a). In order to make out a retaliation claim under Title VII, Montalvo must show that she engaged in protected activity and that, as a result, she subsequently suffered some materially adverse action. Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010). A "materially adverse" action, the Supreme Court has explained, is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason" for its conduct. Collazo, 617 F.3d at 46. If the defendant meets the burden, the plaintiff must then "show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Roman v. Potter, 604 F.3d 34, 39 (1st Cir. 2010) (citation and internal quotation marks omitted). As relevant here, "[f]or a retaliation claim to survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory." Thompson v. Coca-Cola Co., 522 F.3d 168, 181 (1st Cir. 2008) (citations and internal quotation marks omitted)

The Municipality's argument is simple but sound: Because the alleged surveillance or "persecution" (putative retaliatory conduct) commenced before she filed the internal harassment complaint (protected conduct), Montalvo engaged in protected conduct after the allegedly retaliatory acts occurred. Docket # 220, p. 19. So, the argument goes, there is no causal connection between the protected conduct and the retaliatory acts, and no rational factfinder

could conclude that Montalvo was retaliated against. In her opposition, Montalvo does not — for she cannot — blunt the force of this syllogism. Neither can she create a genuine issue of material fact on this front.  This matter can be quickly dispatched.

The heart of Montalvo's retaliation theory is that she was placed under surveillance for filing a complaint with the Municipality. See Docket # 72 ¶ 47.[10] She specifically pled that she was "subjected to retaliation ("persecution") as a result of the internal sexual harassment complaint she filed" and that the Municipality "retaliated against the plaintiff after she filed the internal sexual harassment complaint. Id. ¶¶ 51, 58, and 76 (emphasis added). The Court assumes dubitante that the instant surveillance is a materially adverse action. See Fercello, 612 F.3d at 1081 (noting that "placing an employee under constant surveillance could be evidence of retaliation" (citing Kim v. Nash Finch Co., 123 F.3d 1046, 1061 (8th Cir. 1997) (emphasis added))).[11]

But as the Municipality correctly alleges (and the plaintiff does not dispute), Montalvo did not engage in protected conduct (i.e., she did not file the internal complaint), before the allegedly retaliatory surveillance (the alleged retaliatory act), such that a reasonable jury could logically conclude that the surveillance was in retaliation for filing the internal complaint. Indeed, neither Correa nor the Municipality could have possibly ordered the investigation in retaliation for Montalvo's protected conduct of filing the complaint, because her complaint was

_____

[10] As noted previously, the Court had granted Montalvo leave to amend her complaint to develop her retaliation cause of action based on persecution. Later on, as a result of a disagreement at the conference, the parties were ordered to brief this issue again. The parties complied, and on March 9, 2012, an ordered was entered clarifying that Montalvo's retaliation claim based "exclusively on persecution [was] very much alive." Docket # 136, p. 2 (emphasis added). Nevertheless, the Court reiterated that her other retaliation claims "(i.e., sham investigation, hostility from co-workers, and the Mayor's insistence in transferring her to another department) were and remain dismissed." Id. To the extend that Montalvo's opposition resurrects these dismissed and meritless claims, the Court disregards them.

[11] To be sure, while the record does not show that Montalvo was placed in constant surveillance, neither defendant disputes this point.

not even in existence when Correa delivered the order to Ortiz, and the investigation commenced. In short, there is no causal connection between the alleged retaliatory acts and the protected conduct. See Fercello, 612 F.3d at 1081.

Not content to let the matter rest, Montalvo resists dismissal. As part of her 80-page combined oppositions, Montalvo managed to introduce a new theory of retaliation. Perhaps recognizing the infirmity that just sounded the death knell on her only-surviving  retaliation claim, Montalvo switches gears. She now argues that she was retaliated against — not for filing the internal complaint but — for rejecting Correa's sexual advances. The rejections, she further maintains, constituted protected conduct. Under this new scenario, the putative protected conduct (the rejections) allegedly occurred before Correa commenced the surveillance or "persecution." So,  Montalvo submits, this form of protected conduct preceded the alleged retaliatory conduct.

Arguing that Montalvo "attempt[s] to amend the pleadings by switching her theory of retaliation," the Municipality opposes and  "categorically objects" to it. Docket # 220, p. 20. The Municipality also refers to Montalvo's theory of retaliation "as a continuously moving target that must be stopped." Id., p. 19. The Municipality therefore alleges that the Court should reject Montalvo's allegation that her rejection of sexual advances constituted protected conduct for purposes of claiming retaliation under Title VII. Id., p. 21. Although this is a close call, the Court agrees with the Municipality, rejecting Montalvo's contentions on procedural grounds.

A sensible rule in this circuit dictates that "the necessary factual averments are required with respect to each material element of the underlying legal theory.... Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir.1990); Lugo v. Avon Products, Inc., 777 F. Supp. 2d 275, 298 (D.P.R. 2011). "[P]laintiffs may [not] leave defendants to forage in forests of facts, searching at their peril for every legal theory that a court may some day find lurking in the penumbra of the record." Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1172, 1995

39 (1st Cir. 1995); see also Ruiz Rivera v. Pfizer Pharmaceuticals, LLC, 521 F.3d 76, 85 (1st Cir. 2008) ( "It simply will not do for a plaintiff to fail to plead with adequate specificity facts to support a . . . claim, all-the-while hoping to play that card if her initial hand is a dud." (citing Fleming, 922 F.2d at 24)).

The Municipality calls out Montalvo for purporting to do just that here. Nowhere in her amended complaint, the Municipality correctly points out, does Montalvo remotely allege that the protected conduct giving rise to the retaliation claim was her alleged rejection of Correa's sexual advances. It is true, as Montalvo demurs, that her amended complaint contains allegations regarding the alleged rejections. But as correctly observed by the Municipality, whenever Montalvo refers to such rejections, she does so only in support of her sexual harassment claim. See Docket # 72, ¶¶ 25-27, 41-43 & 47. Again, the only specified pleading under the heading "Second Cause of Action Retaliation (local and federal)" and page 12 of the Amended Complaint is that "[t]he defendant retaliated against the plaintiff after she filed the internal harassment complaint." Docket # 72, ¶ 76 (emphasis added); cf. Fabrica de Muebles J.J. Alvarez, Incorporado v. Inversiones Mendoza, Inc., 682 F.3d 26, 34 (1st Cir. 2012) (affirming dismissing "because . . . statutes are briefly mentioned in the complaint . . . rather than pled as causes of action . . . "). The rejection theory was first propounded in Montalvo's opposition to the Municipality's motion for summary judgment. And under Fleming, "that was too late." U.S. ex rel. Jones v. Brigham and Women's Hosp., 678 F.3d 72, 92 (1st Cir. 2012).

This conclusion finds support in Lugo. There, the court refused to consider, not a new claim, but "additional adverse employment actions that Plaintiff argued in her response to the motion for summary judgment as being related to her retaliation claim." Judge Pérez-Gimenez persuasively reasoned that such new actions "were [not] included in her pleadings." Lugo, 777 F. Supp. 2d at 298; accord U.S. ex rel. Jones, 678 F.3d at 92 ("[I]t was not until Jones filed his motion for summary judgment that he propounded the theory that the Defendants' failure to investigate and report any inquiry was itself a false claim, independent of his claims regarding

the use of falsified data not subject to a reliability study."). That same reasoning applies here. The upshot is that this new retaliation theory that Montalvo covertly advances was not properly pled.

The same conclusion follows even if the Court construed the new retaliation theory as an amended pleading. It is beyond dispute that a plaintiff is precluded from amending her complaint "through argument at the summary judgment phase of proceedings." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244 , 1258 n. 27 (11th Cir.2012), cert. denied, 133 S.Ct. 856 (2013). U.S. ex rel. DeKort v. Integrated Coast Guard Sys., 475 F. App'x 521, 522 (5th Cir. 2012) (per curiam); Bell v. City of Philadelphia, 275 F. App'x 157, 160 (3d Cir. 2008); Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008); Tucker v. Union of Needletrades, Indus. & Textile Employees, 407 F.3d 784, 788 (6th Cir. 2005); Shanahan v. City of Chi., 82 F.3d 776, 781 (7th Cir.1996). Montalvo has failed to request leave to file a second amended complaint to include her new theory of retaliation. See Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 53 (1st Cir. 2011). Montalvo's theory of retaliation is indeed a moving target that runs contrary to Rule 16(b)'s purpose of "assur[ing] that at some point both the parties and the pleadings will be fixed." O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 154 (1st Cir. 2004) (quoting Advisory Committee Notes to the 1983 Amendments to Fed. R. Civ. P. 16(b)).[12]

Therefore, the Court concludes that Montalvo's retaliation claim is limited to the adverse employment actions that resulted from filing the internal complaint, which the Court already determined, cannot survive summary judgment. Because the Municipality did nothing that

[12] Although Montalvo may constructively amend her pleadings by implied consent, see Fed. R. Civ. P. 15(b), no grounds for such amendment exist here. The Court provided Montalvo with ample opportunity to fully develop her persecution retaliation claim, see, e.g., note 10 above, but she failed to include this new retaliation theory. Moreover, Montalvo has not introduced, and the Municipality has not acquiesced to the introduction of, any evidence relevant only to her new retaliation theory. See Rodriguez, 57 F.3d at 1172.

"might have dissuaded a reasonable worker from making or supporting a charge of discrimination," Thompson v. N. Am. Stainless, LP, 131 S. Ct. 863, 868 (2011) (citation and internal quotation marks omitted), no "fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson, 477 U.S. at 252. To the contrary, the Municipality took reasonable, concrete  (and ultimately effective) actions to protect Montalvo from Correa.

Montalvo retaliation theory has been deficient from the beginning; it is time to put an end to it. The Municipality's summary judgment motion on this point is therefore **GRANTED**, and Montalvo's Title VII retaliation claim is **DISMISSED with prejudice**.

*III.    Individual Liability under Title VII*

As indicated, Montalvo also seeks to hold Correa individually liable under Title VII. Correa opposes, arguing that he cannot be held individually liable under Title VII. Correa has the winning argument.

While courts in this district had long declined to impose individual liability under Title VII, e.g., Hernandez v. Wangen, 938 F.Supp. 1052, 1065 (D.P.R. 1996), it was not until 2009 that the First Circuit "definitively held that there is no individual liability under Title VII." Rey-Cruz v. Forensic Sci. Inst., 794 F.Supp.2d 329, 334 (D.P.R. 2011) (Dominguez, J.) (citing Fantini, 557 F.3d 22, 31 (1st Cir. 2009) (Dominguez, J.)); Vera, 622 F.3d 17 at  25 n. 8 ("Title VII does not create liability against individual employees."(citing  Fantini, 557 F.3d 22 at 28-31)). In fact, the First Circuit appears to have been one of the last Court of Appeals to have joined its sisters courts in  concluding that there is no individual supervisory liability under Title VII. See Mitchell H. Rubinstein, Employees, Employers, and Quasi-Employers: An Analysis of Employees and Employers Who Operate in the Borderland Between an Employer-and-Employee Relationship, 14 U. Pa. J. Bus. L. 605, 654 (2012) (collecting cases, and noting that "all twelve circuits have concluded that there is no individual supervisory liability under Title VII"). This should dispose of the controversy.

In an effort to escape her precarious position, Montalvo clinches to a line of (pre-Fantini) cases from this district that recognized an exception to the no-individual-liability-rule: The so-called alter ego doctrine, see Santiago v. Lloyd, 33 F. Supp. 2d 99, 103 (D.P.R. 1998), and its progeny, see Canabal, 48 F. Supp. 2d at 96; Pacheco Bonilla v. Tooling & Stamping, Inc., 281 F. Supp. 2d 336, 338 (D.P.R. 2003) (noting that in Santiago this district "carved out an exception" to the rule prohibiting imposition of individual liability under Title VII); see also note 7 above. As a threshold matter, and as correctly noted by amicus, no other federal court outside this district appears to have followed this questionable alter-ego exception. Montalvo also has three other hurdles; she overcomes none of them.

First, the alter ego doctrine, at least as construed outside this district, runs counter to the holding in Fantini. See Bates v. Private Jet Commercial Group, Inc., No. 11-CV-547, 2013 WL 865849, at *1 (D.N.H. Mar. 7, 2013) (stating purported incompatibility). Why, one may ask, does it run afoul of Fantini?  The answered is in turn provided by Montalvo's second hurdle: The Court of Appeals that have tackled this issue have squarely rejected the alter ego doctrine as contrary to "Congress' aversion to individual liability under Title VII." Worth v. Tyler, 276 F.3d 249, 262 (7th Cir. 2001);  Dearth v. Collins, 441 F.3d 931, 934 (11th Cir. 2006) (holding that there is "nothing in Title VII that supports . . . [plaintiff's] claim that individual capacity liability can be imposed on the basis of the alter ego doctrine"); see also Lafferty v. Owens, Schine & Nicola, P.C., No. 3:09cv1045, 2012 WL 162332, at *10-11 (D.Conn. Jan. 18, 2012) (rejecting alter ego doctrine). And nothing suggests that the First Circuit, who has not spoken on the matter, would rule differently.  If more were needed,  this court recently described the no-individual-liability rule as "absolute," reasoning that "the Fantini court made no room for . . . exception[s]." Marquez-Ramos v. Puerto Rico, No. 11-1547, 2012 WL 1414302, at *6 (D.P.R. Apr. 2, 2012); accord Amicus Brief, Docket # 76, p. 4 (arguing that individual liability since has been "foreclosed by the First Circuit's superseding decision in [Fantini], and Puerto Rico law"). Because the alter ego doctrine— at least as construed by courts like Santiago— runs

head-on into <u>Fantini</u>'s unequivocal no-individual-liability rule, the Court rejects it. Montalvo's reliance on those cases is therefore misplaced.[13]

As Correa cannot be held liable under Title VII, Montalvo's Title VII claims against him falter. This suffices to lay Montalvo's contrary argument to rest. Accordingly, Correa's summary judgment motion is **GRANTED** on this front, and the Title VII claims against him are therefore **DISMISSED with prejudice**.[14]

### IV.  Employer Liability

The Municipality, Montalvo and amicus devote the bulk of their briefs to the issue of employer liability under a Title VII sexual harassment claim. This is unsurprising, given the procedural complications caused by this issue at the inception of this case.

The Municipality attempts to convince the Court that it can summarily hold that Correa is not its alter ego or proxy. Instead, the Municipality says, the Court should determine that Correa is simply a supervisor. <u>See</u> Docket # 220, p. 25 ("[Correa] was clearly a supervisor under Title VII, not an alter ego of the Municipality."). Because Montalvo suffered no tangible employment action, the Municipality would then be able to avail itself of the <u>Faragher/Ellerth</u> defense. Montalvo, on the other hand, maintains that genuine issues of material fact preclude

---

[13] It is worth noting that the Puerto Rico Supreme Court's decision in <u>Rosario Toledo v. Distribuidora Kikuet, Inc.</u>, 151 P.R. Dec. 634 (2000) (holding that harassing supervisor is "liable in his personal nature for his own acts of sexual harassment") overruled sub silentio <u>Santiago</u>'s other holding that Law 100 does not support a cause of action against individual defendants. <u>Bonilla-Perez v. Citibank NA, Inc.</u>, 892 F.Supp.2d 361, 366 n. 2  (D.P.R. 2012) ("Tersely put, <u>Kikuet</u> overruled this line of cases.") (citing, <u>inter alia</u>, <u>Santiago</u>, 33 F.Supp.2d at104-05).

[14] As later discussed, Correa does not fare as well on Montalvo's sexual harassment claims under some state laws (Laws 17 and 69). Moreover, the Court rejects Correa's perfunctory request to decline supplementary jurisdiction over Montalvo's state-law claims. <u>See</u> <u>Zannino</u>, 895 F.2d at 17.  In any event, the Court decides to exercise jurisdiction over Montalvo's remaining state-law claims against Correa, as "interests in judicial economy, convenience, and fairness weigh[] overwhelmingly in favor of the court's exercising its jurisdiction." <u>Redondo Const. Corp. v. Izquierdo</u>, 662 F.3d 42, 49 (1st Cir. 2011).

such determinations. For the reasons laid out below, whether Correa is the Municipality's alter ego or not is unamenable to disposition via summary judgment.

The alter ego issue is a threshold matter in this case. Indeed, holding that Correa is the Municipality's alter ego, the Court has already made clear, would  bar the Municipality from invoking the Faragher/Ellerth defense. See Montalvo Rios v. Municipality of Guaynabo, No. 10-1293, 2011 WL 1258618, at * 4 (D.P.R. Mar. 24, 2011) (collecting cases). While the First Circuit has not shed light on this matter, every other Court of Appeals "to have considered this issue has held that the Faragher/Ellerth affirmative defense is unavailable when the supervisor in question is the employer's proxy or alter ego." Townsend v. Benjamin Enterprises, Inc., 679 F.3d 41, 52 (2d Cir. 2012) (collecting cases); accord, e.g., Velez Cortes v. Nieves Valle, 253 F. Supp. 2d 206, 215 (D.P.R. 2003), aff'd sub nom. Velez v. Awning Windows, Inc., 375 F.3d 35 (1st Cir. 2004). And given that no one appears to quarrel with this premise, the analysis starts here.

Given that proxy (or alter-ego) issues have mostly arisen on the corporate context (e.g., a defendant corporation), case law involving public entities such as the Municipality is scant. For a start, Municipalities are neither structured as nor function like corporations, see, e.g., United Haulers Ass'n, Inc. v. Oneida-Herkimer, 550 U.S. 330, 342 (2007) (observing that "municipalities are not private businesses—far from it"), so cases examining corporations may therefore be inapt. For example, as amicus ably observes, no individual could ever be "identical" to a governmental entity given the structure and reach of public sector employers, as compared, for instance, to the owner and president of a small company who serves as its sole manager. Docket # 76-1, p. 14. Moreover, because an individual cannot have ownership or stock interest in a public entity, such as municipalities, it would be impractical to apply this factor to a public employer.

Previously, and relying on some cases from this district, e.g., Econo, 204 F.Supp.2d at 296, the Court incorrectly announced a six-factor test to determine proxy or alter-ego status. See

note 7 above. The Municipality invites this court to employ this method again, see Docket # 169, p. 5 (citing Econo, Canabal, and Santiago). This is unsurprising given that the application of that rigid six-factor favors the Municipality, see, e.g., id., p. 8 ("requiring identicality between employer and the individual for the individual to be considered alter ego" (citing Santiago, 33 F. Supp. 2d. at 99)). The Court declines the invitation, agreeing instead with Montalvo and amicus that a "flexible approach," permitting courts to consider the "totality of the circumstances," Docket # 76, p. 4, is the appropriate framework to gauge whether a high-level official and supervisor (such as Correa) is a municipality's alter-ego. As concluded in Section III above, moreover, the Canabal and Santiago courts applied the alter-ego doctrine in the corporate context of "individual" liability under Title VII. Applying that framework to decide employer liability of a public entity, the Court hereby reiterates, is also problematic. The Municipality's reliance on those cases is thus mislaid.

Before revising the framework, some background is in order. The Supreme Court granted certiorari in Faragher and Ellerth to provide guidance regarding the standards of employer liability in Title VII harassment cases. See Faragher, 524 U.S. at 785-86. The Court's analysis began with the reminder that "Congress has directed federal courts to interpret Title VII based on agency principles." Ellerth, 524 U.S. at 755. The Court then went on to hold that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Id. at 765. Vicarious liability automatically attaches and no affirmative defense is available when: (1) the harasser acts as the employer's "proxy," or (2) "the supervisor's harassment culminates in a tangible employment action, such as a discharge, demotion, or undesirable reassignment." Faragher, 524, U.S. at 789, 808.[15]

--------

[15]In all other instances, employers may assert an affirmative defense to vicarious liability by establishing that "'(1) that its own actions to prevent and correct harassment were reasonable" and (2) "that the employee's actions in seeking to avoid harm were not reasonable." Chaloult v. Interstate Brands Corp., 540 F.3d 64, 66 (1st Cir. 2008) (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at

As particularly relevant here, the Court in <u>Faragher</u> and <u>Ellerth</u> also provided guidance for courts considering whether a harasser acted as an employer's alter ego or proxy. Under the Restatement (Second) of Agency § 219(2)(a), an employer may be liable for the acts of its agents, "where the agent's high rank in the company makes him or her the employer's alter ego." <u>Ellerth</u>, 524 U.S. at 758. <u>Faragher</u> itself, which concerned harassment claims against the City of Boca Raton, cited with approval several Court of Appeals decisions finding that the following types of officials may be treated as an employer's alter ego or proxy: A president, owner, proprietor, partner, corporate officer, or any other supervisor "hold[ing] a sufficiently high position in the management hierarchy" for his actions to be imputed automatically to the employer. <u>Faragher</u>, 524, U.S. at 789 (citations and internal quotation marks omitted). The Court thus acknowledged that a variety of instances may exist where a  harasser acts as an employer's alter ego or proxy. <u>See id.</u> Unfortunately, "the Court has yet to examine the alter-ego theory in any detail . . . ." <u>Helm v. Kansas</u>, 656 F.3d 1277, 1285 (10th Cir. 2011). Nevertheless, the Court in <u>Faragher</u> and <u>Ellerth</u> "declined to adopt any rigid or particular tests to determine when a harasser's actions become that of his employer," as correctly observed by amicus. Docket # 76-1, p. 7.

Courts considering proxy or alter-ego issues after <u>Faragher</u> and <u>Ellerth</u> have considered the totality of the circumstances, employing a flexible approach to evaluate the types of evidence pertinent to the particular employment context. <u>See</u>, <u>e.g.</u>, <u>Bridas S.A.P.I.C. v. Gov't of Turkmenistan</u>, 345 F.3d 347, 359 (5th Cir. 2003) ("finding that "district court erred in premising its conclusion solely upon the existence of  corporate formalities and an absence of comingling of funds and directors", because "alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions."); <u>Estate of Lisle v. C.I.R.</u>, 341 F.3d 364, 378 (5th Cir. 2003).There appears to be no First Circuit guidance on this score, and few courts have addressed the issue in cases involving public

765).

employers, such as the Municipality. See Helm, 656 F.3d at 1286-1287 (noting that "[t]he contours of the alter-ego theory are not well defined" and that "virtually every case addressing the alter-ego issue has arisen in the corporate context").

The Seventh Circuit's Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000), appears to have been the first (post-Faragher/Ellerth) decision at the appellate level to have tackled the issue. There, the plaintiff, a secretary who worked for defendant Department of Veteran Affairs ("VA"), alleged that her supervisor, the Chief of Police at a local hospital, sexually harassed her. The district court held that the defendant was protected from liability by the Faragher/Ellerth affirmative defense. On appeal, the plaintiff argued, much like Montalvo maintains here, that the defendant could not avail itself of the affirmative defense, because the alleged harasser was the defendant's alter ego or proxy. Writing for an unanimous panel, Judge Diane Wood recognized at the outset that "hold[ing] a sufficiently high position in the management hierarchy" for his actions to be imputed automatically to the employer. Id. (citing Faragher, 524, U.S. at 789). In deciding whether the harasser in Johnson was the employer's alter ego, Judge Wood looked at relevant circumstances, to wit: the number of supervisors the harasser had both at the particular employment site and throughout the organization's nationwide bureaucracy; the harasser's ability to change the terms and conditions of the plaintiff's employment beyond nominally signing off on performance appraisals; and whether the employer had various systems in place to check the behavior of its own-level supervisors, such as disseminated policies and complaint procedures that allowed an employee to make a complaint without having to go through the offending supervisor. Id.

The Seventh Circuit ultimately concluded that the harasser was not the VA's alter ego or proxy. The court stressed that the harasser (1) was a "low-level supervisor"; (2) and "had no ability to change the terms and conditions of Johnson's employment." Id. Moreover, the court held that "the VA had systems in place to check the behavior of its low-level supervisors like Williams: it disseminated its sexual harassment policy and had grievance procedures through

which an employee could make a complaint without having to go through the offending supervisor." Id. In sum, the court held that the chief of police was not the VA's alter ego because "he was not a high-level manager whose actions 'spoke' for the VA." Id. (citation omitted); Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 384 (5th Cir. 2003) ("[T]he only factor relevant to the determination of whether [the former president and general manager] was a proxy for [the corporation] is whether he held a 'sufficiently high position in the management hierarchy' so as to speak for the corporate employer.")

More recently, in Helm the Tenth Circuit held that  state district judges cannot be alter egos. 656 F.3d at 1286.  Acknowledging that "virtually every case addressing the alter-ego issue has arisen in the corporate context," the court nonetheless made clear that "this does not necessarily mean that a public official can never qualify as the alter ego of a government entity." Id. "Few public officials," the court further explained, "are vested with the same degree of power over a government entity as, for example, a corporate president has over a corporation." Id. The Tenth Circuit then declined to "meticulously define the narrow class of public officials who hold that kind of power," reasoning that it was "clear that state district judges do not qualify." Id. at 1287. The court said:

> State district judges do not exercise a sufficient degree of control over the myriad operations of the state. Rather, they operate in a limited sphere (the judicial branch) and perform a limited role (interpreting and applying the law that is enacted by other state officials). Furthermore, their decisions are subject to review and reversal by "higher ranking" state judges. For these reasons, state district judges, although they have considerable authority, do not occupy positions in the top echelons of the state's management. Nor does any state district judge speak for and represent the state. Indeed, the essential task of all judges is to be independent of the state, even to the extent of occasionally being asked to review the constitutionality or other legality of state actions. Id. (emphasis in original).

The above cases illustrate how courts have considered a variety of factors and evidence when evaluating whether a harasser is the alter ego or proxy of his employer. A non-exhaustive list of these considerations include the following: whether the harasser is a low-level supervisor;

the number of supervisors above the harasser; the ability of the harasser to affect the terms and conditions of the plaintiff's employment; whether the harasser had duties and responsibilities that could be considered similar to a proprietor, partner or corporate officer in a corporate environment; and whether the harasser was high level enough that his actions "spoke" for the employer. See Johnson, 218 F. 3d at 730; Helm, 656 F.3d at 1286; Townsend, 679 F.3d at 5. Inasmuch as no single factor is determinative, however,  alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions. Bridas S.A.P.I.C., 345 F.3d at 359; Seven Arts Pictures, Inc. v. Jonesfilm, CIV.A. 09-4814, 2012 WL 5398439, at * 12 (E.D. La. Nov. 1, 2012). Having clarified the proper legal framework, the Court turns to the facts of this case.

It is undisputed that Correa, as the Municipality's Commissioner, lacked the authority to hire and fire employees in the Department; the Mayor had the authority to supersede all of Correa's decisions. Moreover, Correa only directed the Department, so he had little or no influence over the rest of the Municipality's 13 departments. Neither did Correa have the kind of duties and responsibilities that could be considered similar to a proprietor, partner or corporate officer in a corporate environment. See  Kaupas v. Vill. of Univ. Park, 02 C 3674, 2003 WL 22048173 (N.D. Ill. Sept. 2, 2003). But it is equally undisputed that, unlike the Police Commissioner in Johnson,  Correa was no "low-level supervisor." Indeed, the alleged harasser in Johnson, was the Chief of Police at a local hospital of a major federal agency (VA) with offices across the country, who "had no less than two supervisors . . . within the hospital and no doubt others within the VA's bureaucracy." 218 F.3d at 730. Contrarily, the Municipality is a substantially smaller public employer. To the extent that he was the Chief Police Commissioner of the entire Municipality, Correa held a high-level rank within the Municipality. Unlike other less important divisions, police departments are integral components of a large municipality like Guaynabo. Correa had no supervisors above him in the Department, as he was the head of a large Department that included at least 15 divisions. Outside the Department, he

only answered to the Mayor. Cf. Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1233 (10th Cir. 2000) (holding that an alter ego instruction was appropriate when supervisor in question answered only to the company's president).[16]

A jury could also believe that Correa, as the Department's high-ranking officer, had enough authority and power to affect, to some extent, the hours, wages, and working conditions of its subordinates. Although the record is inconclusive, the Court must draw the following reasonable inference in favor of Montalvo: The Mayor deferred to Correa's recommendation and judgments regarding the Department's employment decisions. Cf. Townsend, 679 F.3d 41 54(finding that harasser was employer's proxy because, among other things, he collaborated with the corporation's president "on corporate decisions including hiring, and the supervisors and managers in the field reported directly to him"). Viewed in the light most favorable to Montalvo, moreover, a jury could conclude that Correa's actions "spoke" for the Municipality. See Ackel, 339 F.3d at 384 ("[T]he only factor relevant to the determination of whether [the former president and general manager] was a proxy for [the corporation] is whether he held a 'sufficiently high position in the management hierarchy' so as to speak for the corporate employer." (quoting Faragher, 524 U.S. at 789)). Contrary to the state judge in Helm, who had neither policy-making powers nor influence over important official matters, Correa "participate[d] in the process of creating public policy," Docket # 185-1, p. 52:19-21, insofar as he "made press statements" on behalf of the Municipality without prior approval from the Mayor. Id., pp. 52-53. Correa also had the power to "prepare[] and administer[] the expense budget of the Municipal Police" and "manage[] administrative complaints filed by citizens against Municipal Police personnel." Docket # 189-2, p. 2.

The evidence of record thus shows "conflicting yet plausible inferences" that make summary judgment improper. Manganella v. Evanston Ins. Co., 702 F.3d 68, 73-74 (1st Cir.

---

[16] The Court is unpersuaded by the Municipality's insistence that Correa was subordinated to the Municipality's Director of Operations.

2012); Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 764 (1st Cir.1994); see also Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir.1995) (explaining that "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage").  As described above, the evidence of record before the Court can support "the sort of divergent but plausible inferences as to a key issue that make summary judgment unavailable." Manganella, 702 F.3d at 73-74 (citation omitted). There are genuine issues of material fact as to whether Correa was the Municipality's proxy or "alter ego" such that any harassing conduct on his part should automatically be imputed to the Municipality. As another court recently held, a jury will decide this pivotal question based on the evidence presented to it. See E.E.O.C. v. Evans Fruit Co., Inc., CV-10-3033-LRS, 2012 WL 5929956, at * 4 n. 1 (E.D. Wash. Nov. 27, 2012).

Accordingly, the Municipality cannot satisfy its summary judgment burden of proving as a matter of law that Correa was not its "alter ego" or proxy. As to the  Faragher/Ellerth defense, given that a jury could find that Correa is the Municipality's alter ego — such that any harassing conduct on his part would automatically be imputed to the Municipality — resolving the applicability of this defense would be advisory. The Municipality claim for protection under the Faragher/Ellerth defense is thus unripe for adjudication.

Therefore, at this stage in the litigation, Montalvo has sufficiently demonstrated a basis for the Municipality's liability as Correa's employer. The Municipality's summary judgment request on these scores is **DENIED**.

*Supplementary Claims*

*I.      Laws 17, 69 and 100*

As indicated, Montalvo alleges that the defendants also violated Puerto Rico Law 17, which provides that sexual harassment in employment is "an illegal and undesirable practice," P.R. Laws Ann. tit. 29, § 155, and Law 69, which prohibits gender based employment

discrimination, id. § 1321. Montalvo also claims that the defendants contravened Law 100, the local broad antidiscrimination statute, P.R. Laws Ann. tit. 29, § 146. The Municipality avers that Laws 100, 69 and 17 are inapplicable to municipalities. Docket # 169, p. 22. Montalvo disagrees, arguing that employers are liable under such laws irrespective of whether they are governmental or private employees.

The First Circuit recently reiterated that "Law 17 and 69 serve virtually the same purposes and outlaw essentially identical behavior, and Law 69's specific prohibition on gender discrimination overlaps with Law 17's bar on sexual harassment." Gerald, 707 F.3d 7 at 28 (citing García v. Sprint PCS Caribe, 841 F.Supp.2d 538, 564 (D.P.R. 2012)). More importantly, "the substantive law of Puerto Rico on sexual harassment appears to be aligned with Title VII law; the latter's precedents being used freely to construe the former." Id. (citing Hernández–Loring v. Universidad Metropolitana, 233 F.3d 49, 52 (1st Cir. 2000)). The same holds true about Law 100. E.g., Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 169 n. 3 (1st Cir.) (describing analogy between Law 100 and Title VII), cert. denied, 130 S.Ct. 362 (2009). On the merits, then, the Court would deny the defendants' request for summary judgment on Montalvo's Law 17, 69, and 100 claims, precisely for the same reasons that the Court denied the defendant's summary judgment on Montalvo's Title VII harassment claim. See Gerald, 707 F.3d 7 at 28; Godoy v. Maplehurst Bakeries, Inc., 747 F. Supp. 2d 298, 318 (D.P.R. 2010).

But the defendants argue that Law 100 is inapplicable to public entities such as municipalities. They are correct. It is well settled that Law 100 applies neither to municipalities, e.g., Rodriguez Cruz v. Padilla Ayala, P.R. Offic. Trans., 125 P.R. Dec. 486 (1990) ("Act No. 100 does not apply to municipalities.") (emphasis in original) nor to "municipal employees." Acevedo-Torres v. Municipality of Arecibo, 857 F. Supp. 2d 231, 237 (D.P.R. 2012); see also, e.g., Perez-Gonzalez v. Municipality of Anasco, 769 F. Supp. 2d 52, 65 (D.P.R. 2010); Vega

Marrero v. Consorcio Dorado-Manatí, 552 F.Supp.2d 157, 171 (D.P.R. 2007). Accordingly, the defendants are entitled to summary judgment on this score. Montalvo's Law 100 claims are therefore **DISMISSED with prejudice**.

Montalvo's Laws 69 and 17 claims stand on a stronger footing. Law 17 explicitly imposes liability on "municipal governments and any of its municipal instrumentalities or corporations." P.R. Laws Ann. tit. 29, § 155a; see Talavera-Ibarrondo v. Municipality of San Sebastian, No. 09-1942, 2012 WL 5353557, at *2-3 (D.P.R. Oct. 31, 2012).  And while Law 69 surely lacks Law 17's explicitness on municipality liability, courts have interpreted both statutes collectively, see, e.g., Gerald, 707 F.3d 7 at 28, and municipal liability is not the exception, see Talavera-Ibarrondo, 2012 WL 5353557, at *2-3 (applying both Law 17 and Law 69 against municipality). Above all, the defendants have provided no good reason to interpret Law 69 differently, as neither the Municipality nor Correa offers case law that would support a contrary conclusion. Summary judgment on Montalvo's Laws 17 and 69 claims is unwarranted.

## II.    Law 115

The Municipality next posits that because Montalvo "has failed to produce any evidence that she offered or attempted to offer testimony" before a legislative, administrative or judicial forum, her Law 115 claims cannot prosper. Docket # 169, p. 23. Montalvo opposes, arguing that her testifying in the administrative hearing regarding her sexual harassment allegations constitutes protected conduct. Montalvo's Law 115 claims cannot survive summary judgment.

The Puerto Rico Whistle-Blower Act, commonly known as Law 115, P.R. Laws Ann tit 29, § 194 et seq., provides in pertinent part:

> (a) No employer may discharge, threaten, or discriminate against an employee
> regarding the terms, conditions, compensation, location, benefits or privileges of

the employment should the employee offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico, when such expressions are not of a defamatory character nor constitute disclosure of privileged information established by law.

In order to make out a prima facie case under Law 115, a plaintiff must "establish, by direct or circumstantial evidence . . . that he or she (1) participated in an activity protected by [Law 115] and (2) was subsequently discharged or otherwise discriminated against." Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 45 (1st Cir. 2010) (citations and internal quotation marks omitted); Miranda v. Deloitte LLP, No. 12-1271, 2013 WL 485880, at *10 (D.P.R. Feb. 8, 2013) (to be published in F. Supp. 2d).

The Court need not tarry long here. Inasmuch as Montalvo testified at the administrative hearing regarding the sexual harassment allegations, she clearly participated in protected activity. That is, she did "offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico." P.R. Laws Ann. tit. 29, § 194a(a). But the undisputed evidence of record shows that Montalvo was neither discharged nor discriminated against for engaging in such protected conduct. Quite the opposite is true: After she testified at the administrative hearing, Montalvo remained working under the same "terms, conditions, compensation, location, [and] benefits," P.R. Laws Ann tit 29, § 194 (a), and the Municipality took reasonable, concrete (and ultimately effective) actions to protect Montalvo from Correa. What is more, Correa even resigned shortly thereafter. In short, no reasonable fact finder could find that the defendants retaliated against Montalvo for testifying at the hearing.

In any event, because Montalvo's Title VII retaliation claims are wholly without merit, her Law 115 claims must suffer the same fate. See Godoy, 747 F. Supp. 2d at 31 ("Given that Law 115 requires the same adverse employment action showing as a Title VII retaliation claim,

courts have treated the two claims the same." (citing Rivera Rodriguez v. Sears Roebuck De Puerto Rico, Inc., 367 F.Supp.2d 216, 230 (D.P.R. 2005))). Accordingly, Montalvo's Law 115 claims are hereby **DISMISSED with prejudice**.

    *III.    Articles 1802 and 1803*

    Finally, the defendants argue that because Montalvo's claims under the general tort statutes are based on conduct governed by specific Puerto Rico's labor laws, her claims under Articles 1802 and 1803 based on the same conduct are barred under Puerto Rico law. The defendants are partially correct.

    It is a matter of bedrock law in this jurisdiction that "the provisions of the Civil Code are supplementary to special legislation." Barreto v. ITT World Directories, Inc., 62 F.Supp.2d 387, 393 (D.P.R. 1999) (citing Rosario v. Atlantic Southern Ins. Co., 95 P.R. Offic. Trans. 742, 747 (1968); Berrocales v. Tribunal Superior, 102 P.R. Dec. 224, 226 (1974)). Specifically, in the labor and employment context, a plaintiff "'is barred from using [conduct covered by a specific labor law] to also bring a claim under Article 1802.'" Medina v. Adecco, 561 F.Supp.2d 162, 175-76 (D.P.R. 2008) (citation omitted). Montalvo's Articles 1802 and 1803 claims can only survive if the complaint properly alleges that the defendants engaged in tortious conduct independent from the alleged sexual harassment and retaliation. See Barreto, 62 F.Supp.2d at 395 (citing Rivera v. Sec. Nat'l Ins. Co., 106 P.R. Dec. 517, 527 (1977)).

    Montalvo correctly alleges that "to the extent that the facts that comprise the illegal surveillance is not covered by the employment law statues, Article 1802 must provide." Docket # 197, p. 50. Because the Court already held that Montalvo's retaliation claims under Title VII and Law 115 could not survive summary judgment, such potentially tortious claims are no longer covered by any specific labor law. Contrary to Law 115 and Title VII, the scope of negligence under Articles 1802 and 1803 is broad—"as broad as the behavior of human

beings... includ[ing] any fault that causes harm or injury." <u>Bonilla v. Chardón</u>, 18 P.R.Offic. Trans. 696, 709, 118 P.R.Dec. 599 (1987) (quoting <u>Colón v. Romero-Barcelo</u>, 112 P.R.Dec. 573, 579 (1982)). Hence, the claim against Correa may be forthcoming under Article 1802, and the claim against the Municipality (as Correa's former employer) may similarly be brought under Article 1803. But the sexual harassment claims, which do survive summary judgment, are already covered by Laws 69 and 17. These duplicative claims, then, cannot be brought under these general tort statutes. They are therefore **DISMISSED with prejudice**.

**Conclusion**

For the reasons stated, the defendants' motions for summary judgment are **GRANTED in part and DENIED in part**. The only remaining claims against the Municipality are the following: The sexual harassment (hostile work environment) under Title VII, and Laws 17 and 69. As to Correa, the only surviving claims are sexual harassment under Laws 17 and 69. Montalvo's general tort statutes under Articles 1803 and 1802 against the Municipality and Correa, respectively, are still before the Court—albeit only insofar as the surveillance  may constitute tortious conduct. All other claims are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of March, 2013.

*S/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge